Okay. May it please the Court, Your Honors, Nathan Zazzal on behalf of Petitioner Jose Armas. I'll skip through some of the intro logs. We just covered that. In this case, Petitioner was arrested by the police. He was lawfully arrested by the police on December 13, 2006, in San Francisco. He was taken into custody. Now, while he was criminal charges were pending, on December 28, a police officer came to his jail cell and told him he had a lawyer. Armas had already retained a lawyer, Christopher Hall, so he was surprised when he saw a woman there in the interview room. She spoke very little Spanish. She said she was an immigration agent, and she wished to ask him some questions. Now, he had been very clearly instructed by his criminal defense attorney, given the criminal charges pending, he wasn't to talk to anyone without his criminal defense attorney present. So he told her his name, and essentially he just said he wouldn't speak with anyone unless his attorney was present. According to his credible testimony, the immigration officer rose to leave, and she asked in English if he was Mexican, and he remained silent, and she left. Now, this testimony was never the credibility of this testimony was never questioned by the immigration judge or by the service or by the Board of Immigration Appeals. This testimony under this Court's case law should be taken as a fact, an uncontested fact of this case. Now, the next thing. Scalia, was there an adverse credibility determination? No. The judge simply summarized all of the evidence, all of the testimony and all of the evidence, and basically gave an opinion. He didn't try to reconcile the fact that the memorandum from the immigration officer. I would have thought your response to my question would have been no, and because of that, our panel has to consider him credible. Oh, sorry. Yes, Your Honor.  Go ahead. So the next day on December 29th, the criminal court judge told him he could be released on his own recognizance. Now, criminal charges were still pending, but he was released on his own recognizance he was allowed to be released. However, he was not permitted to leave because he had the immigration detainer, which was placed on him the previous day. However, this immigration detainer was not based on probable cause, and therefore, at the moment he was free to leave State custody, this turned into an unconstitutional seizure by the Federal Government. Once again, he was, like in the last case, he was held for five days before being transferred to the immigration office, where he was interviewed by an officer. He once again said he wanted to see his lawyer. There were still criminal charges pending against him. At this point, though, he was the officer went silent and didn't respond to his request for a lawyer. So he felt the futility of the circumstance after being detained for five days after he should have been released by the State, and he made statements. As a result, the I-213 was generated, which is what we're seeking to suppress in this case. That's the document that states he's from Peru. Now, interestingly, the immigration officer, the female officer, Lawton, who initially interviewed him, had him, supposedly had him on a list of people of possible birthplaces in Mexico. This is something which goes to the assumption, the assumption that someone who's Hispanic and has an Hispanic appearance is probably an illegal Mexican alien. In this case, there's no probable cause to think he was illegal, and there is certainly no, and certainly when they interviewed him more fully, they found out he wasn't even Mexican, as they had assumed. Well, counsel, if I could ask you a question. If for whatever reason, and he's acting on the advice of his lawyer or whatever, but if for whatever reason, when the immigration officer asks him, are you, are you a Mexican, that he doesn't respond, and he hasn't given any affirmative statement of where he's from, why isn't the government entitled to draw an adverse inference on that issue as you normally can from silence in a civil case? Well, Your Honor, there was no — once you begin talking to a law enforcement agent as a criminal defendant, it's very easy to go down the road where they get you to talk and talk, and then all of a sudden they have statements which you've made which you might not have wanted to make without your attorney present. So I think there's a clear right to have his attorney present. Now, in the civil case, if I go and I talk to someone and I go up to them and say, I want to talk to you, and they say, I don't want to talk, and maybe they depose you, you have the right to have your attorney present. You don't have to talk to someone without an attorney. You've invoked your right to an attorney. While there's no constitutional right that you have to have a free attorney, there is a right that you have, that you should have your attorney when you request it. Now, in the Supreme Court case that established much of this case law, or kind of the which at that point the board had already held were egregious, and one case she cites is Matter of Garcia, a board case where someone is illegally detained. They repeatedly request to have an attorney. The DHS, the INS agents refused to allow that person to have an attorney. And in that case, the charging document was suppressed because that violated fundamental fairness. So I think this issue of invoking the right to an attorney is important. I agree that someone in custody might not have a right just to be silent and never talk to an immigration officer, but if they request an attorney, then I think they should have the right to have an attorney. And then if they're silent, there can be a difference. Okay. Thank you. Okay. Thank you. Do you want to save some time? Oh, yes. I'll reserve my time. Thank you. That's fine. Thanks. Good morning. Again, Jocelyn Wright on behalf of Respondent of the United States Attorney General. As in the other case, Petitioner in this case was held not for five days but 48 hours because it was a weekend. It was a Friday when he was, I believe, it was Thursday that the agent interviewed him. On Friday, the criminal judge released him on his own recognizance. But because it was December 29th, there was the weekend and then the holiday, technically it was only two days, the second and the third. Let me see if I understand the facts of this case, and you correct me if I'm wrong in my recitation of them. First of all, the sort of brooding omnipresence in the sky, if you will, is that this individual is credible for our purposes, right? That's correct, Your Honor. And here's what he says. He says he was arrested, put in custody, and he had an attorney, correct? A criminal attorney, yes. Yes. And someone comes to his cell and tells him his lawyer wants to see him. But it turns out it's not a lawyer at all. It's an ICE agent. So would it be fair for us to assume that either because of collaboration between the ICE agent and the jailer that this man was misled? No, I don't think it would be fair to assume that, Your Honor. What evidence is there that he was not misled? There is no evidence that he was, though. According to his credible testimony, he was told that his lawyer wanted to see him. We know that's not true, correct? That's correct. The person waiting to see him was an ICE agent. Okay. Now, the government wants us to rely upon the conclusions that the ICE agent made during the interview? Yes. And here's the evidence that he was not misled, because when he saw the agent, the agent identified herself as an immigration agent. But to get in the room, he was misled. Would you concede that? No, I would not concede that, Your Honor, because the guard, we have no idea what the guard said to him. So this ICE agent fills out a form saying that Armas admitted his alienage, correct? He admitted that he was he said he was Mexican. She filled out a form saying that he admitted being Mexican, correct, in her interview of him? For clarification, Your Honor, no. She did not fill out a form. She filled out a detainer. And said that he had admitted being Mexican. I don't know what the detainer says, but she did say that he admitted being a foreign national. And we don't know that, again, because we don't have the detainer. That's correct. Okay. He says he gave his name and wouldn't say another word. That's what he says. Okay. So we have an agent who's got a form that says this person admitted alienage by saying he's a Mexican, but the credible testimony of the Petitioner is I gave nothing but my name. When I was asked about alienage, I remained silent. Right? And the fact is he's from Peru. To clarify, Your Honor, again, we don't know what Agent Lawton filled out and what the detainer says. What she did, what she says in her memo to the INS trial, the DHS trial attorney, was that he affirmatively said, after she questioned him, that he was a Mexican national. And that was enough to justify the detainer, because he was a foreign national. How can we believe that and believe him? Again, the record is there's two versions. I agree. But as the government pointed out in its brief, under either version, there was probable cause for the government to place the detainer against Mr. Armas. The probable cause was someone, whether it was this ICE agent or someone else, telling the government that Mr. Armas had admitted being a Mexican, therefore admitted his alienage, when he says, I said nothing. Right. And if my lawyer had allowed me to answer the question, I would have told him I was from Peru, which is where I'm from. That's correct. I mean, but again. So what do we do? Did the BIA or the IJ try to resolve this apparent conflict? No. What they said was under either scenario, there was reasonable suspicion. Then why shouldn't we send it back? Why shouldn't we send it back to determine that? Because there was reasonable suspicion of alienage under either scenario. One, if he's ‑‑ if, as he says, he didn't respond, then as Judge Gold pointed out, then the government could draw an adverse inference. What's your best case in the INS universe that ‑‑ that substantiates that, that says if an alien remains silent when asked, are you from Mexico? I believe it's Trias Hernandez in this case. Is it in your brief? Yes, it is, Your Honor. Okay. But in order to establish that inference, we have to believe the agent. Under that version, yes. That's correct. And we have to disbelieve Armas. Oh, no, no, no, no. I'm sorry. We have to believe Mr. Armas under that scenario, that he didn't say anything and, therefore, the adverse inference was drawn from his silence. And we have to believe that he said something affirmative like, I'm from Mexico. For the detainer to be justified by ‑‑ affirmatively by his alienage. That's correct, Your Honor. All right. I understand your argument. Thank you. Are there ‑‑ if there are any further questions? I have no questions. I have no other questions. Thank you. You had a few minutes left for rebuttal. I just want to clarify, in case I didn't hear this correctly, that the petitioner ‑‑ we had never conceded there was probable cause for the detainer, only that there was probable cause for the initial arrest. And the judge and the BIA really look only to the initial arrest and don't look to whether or not the detainer was lawful. And that's, I think, a distinction where the agency erred. They jumped to, if there's a lawful arrest, well, obviously everything that follows is going to be okay. But what I'd say is that the probable cause has to be established even while he's in custody. And ‑‑ Counsel, Judge Gould, I have the same question in my mind on this case that I had on the last one.  If he doesn't ‑‑ if he's not here legally, then couldn't the government go against him again to remove him even if we suppressed that particular form? I believe it would have to ‑‑ You're saying that that's a ‑‑ are you saying that would be a fruit of, like under WANSA? Right. So he could stay here forever under your theory? No, only that the government would have to have some independent source that's not derived from ‑‑ And what would be an example of it? What would be an example of an independent source? Well, if he were to ‑‑ if he were to get arrested again and then he was lawfully questioned and in custody, that could be one way. What about if they took his fingerprints while he was in custody? If they took his fingerprints while he was in custody, I think that would be the fruit of a poisonous tree. Otherwise, they would figure out ways to get around the suppression motion every time. Any time anybody comes ‑‑ when a defendant appears in court, it's pretty common that before somebody's processed through the jail or whatever, they put down their fingerprint. But that finger ‑‑ I think those fingerprints were already run and they didn't reveal anything. Well, I don't know. I'm just ‑‑ Yeah. I believe on the I-213, they checked. They checked some information he said, and it didn't show something that he said they did check through the system. There's ways to get independent source information. They may have their ways, but I would just think it couldn't be done to target someone who successfully would win a suppression motion. Okay. Okay. And I just want to say, the one thing about the memo by Agent Lawton is not only was that, did she not testify, but that was unsigned and unsworn. So that should be given very little weight regardless, and I think it's correct to give full weight to the petitioner's testimony. That's all I have. If there's no further questions. Okay. Thank you. Thank you. Thank you, counsel. We appreciate your arguments. The matter is submitted.
judges: Hawkins, Gould, Paez